C. M. FREEMAN v. R. P. CROOM, RAMSAUR BROTHERS COMPANY and
W. A. WEBB.

(Filed 15 November, 1916.)

**1. Contracts—Mutual Agreement—Misrepresentations.**

> The mutual consent of the parties is an essential element of every contract, and where one of the parties misrepresents or conceals a material and important fact from the other upon which the minds of both must necessarily agree, the contract thus made is unenforcible.

**2. Same—Mortgages—Registration—Innocent Purchasers.**

Under our registration laws an unregistered mortgage is not good as against purchasers for value, etc., and is, in effect, in such instances, to be regarded as no mortgage; and where a vendor of an automobile takes a mortgage thereon which he does not have registered until after the purchaser has sold or exchanged it for another, and then demands the automobile under his mortgage, representing that it is valid, and an agreement is made on this representation that he should be delivered possession of the automobile upon paying for certain repairs made thereon; in his action to enforce this agreement, it is *Held*, that the minds of the contracting parties had not mutually agreed because of the plaintiff's misrepresentation or suppression of the material fact that the mortgage had been registered, concerning which the defendant was ignorant at the time, and under the evidence of this case an issue of fact was raised for the determination of the jury.

CIVIL ACTION tried before *Justice, J.,* at February Term, 1916, of MOORE.

Plaintiff owned a Hudson automobile and on 4 December, 1913, sold it to defendant W. A. Webb, taking a mortgage on it to secure payment of the purchase money, but this mortgage was not registered until after Webb had exchanged the Hudson car with defendant R. P. Croom for an Overland and $150, at Fayetteville, N. C. The two cars were placed in the garage of defendants Ramsaur Brothers Company, and Croom employed them to make certain repairs to the Hudson car, costing $24.50, for which Croom gave his check. Freeman went to Fayetteville, saw the Ramsaurs and Croom, and told them he had a mortgage on the car, and, as he alleged and testified, Croom agreed that if Freeman would pay the $24.50 for repairs that he would release the Hudson car to him. With reference to this transaction Freeman testified: "We met Mr. Croom coming to the garage, and I told him about it, and Croom said he had traded for the car that day and gave $100 to boot. I told Croom I had a mortgage on the car, and Croom said: 'It is your car. I hate to lose my car and pay repair bill.' I told Croom I would pay the repair bill if he would release the car. Croom said, 'That is a trade, then,' and I gave Ramsaur Brothers Company my check for $24.50, the amount of the repair bill, and Ramsaur Brothers Company gave Mr. Croom his check back that Croom had already given Ramsaur Brothers Company in settlement of the repair bill, and Croom then tore up the check that he had given Ramsaur Brothers Company. I told Ramsaur Brothers Company to make certain other repairs upon the car on account of its having been broken that afternoon, and notify me when the car was ready. The car had been broken that evening, so Mr. Croom said, since the first repairs made. Mr. Croom thereupon told Ramsaur Brothers Company to deliver the car to me as soon as it was ready, or to anybody I sent for it with a mortgage calling for that car."

Plaintiff sent J. A. Thompson for the car, when it was ready, and gave him the money for the repairs made by the Ramsaur Company and the mortgage; but Croom and the Ramsaur Company refused to deliver the car to him. This action was then brought to recover damages for the conversion of it. The court instructed the jury to answer the first and second issues "No" and the third "$24.50," if they believed the evidence, and under this instruction the jury returned the following verdict:

1. Did the defendants, or either of them, wrongfully convert and appropriate to their own use the automobile described in the complaint? Answer: "No."

2. If so, was the plaintiff damaged thereby, and if so, in what sum? Answer: "No."

3. Is defendant Croom indebted to plaintiff, and if (so), in what sum? Answer: "$24.50."

Judgment was entered thereon, and plaintiff appealed.

*Johnson & Johnson, G. H. Humber, and U. L. Spence for plaintiff.*
*Davis & Sandrock for defendants.*

WALKER, J., after stating the case: We have set forth above only so much of the evidence as is essential to an understanding of the ground upon which our decision must rest.

The clear inference from the refusal of Croom and Ramsaur to deliver the car to Thompson for the plaintiff is that it had been discovered that the mortgage was not registered until after Croom had traded for the car with Kelly, and therefore that the plaintiff did not have a valid mortgage on the car, and was not entitled to its possession. The contention of Croom is that the plaintiff virtually represented to him, at the time of the transaction in Fayetteville, that he had a valid mortgage on the Hudson car at the time of the exchange with Kelly, and that even if he told the plaintiff that it was his car or that he would release it to him, as plaintiff testified, he was induced to do so by this false representation, and, therefore, acted under a mistake of fact, and that he would not have made any such agreement for a return of the car, if it be true that he did so, had he known the facts, which were concealed from him. If the plaintiff, when he told Croom that he had a mortgage on the car, suppressed a material fact of which he knew Croom was ignorant, and thereby induced the latter to believe that the mortgage had been registered before the exchange with Kelly, and was, therefore, a valid lien upon the car, then Croom would not be bound by any agreement to release the car, as, to say the least of it, he would have acted under a clear mistake of the facts caused by the representation of Freeman as to the existence of a valid mortgage. An invalid mortgage is really no mortgage. "Assuming that both parties have done something

which is legally sufficient to indicate their assent to the terms of a contract, the question may arise whether the contract is binding in case the assent of one, or both, is seeming but not real." 6 Ruling Case Law, p. 620, sec. 40. "If an attempted contract assumed the existence of, and is based upon the existence of, an essential fact which does not exist, there is no meeting of the minds of the parties in reality, and no contract that can be enforced by either." *Ibid.,* sec. 41. A contract is based upon the agreement or mutual consent of the parties, which, above all others, perhaps, is an essential element of every contract (9 Cyc., 245), and this must be a real consent. "Since mutual consent is essential to every agreement, and agreement is generally essential to a contract, there can, as a rule, be no binding contract where there is no real consent. Apparent consent may be unreal because of mistake, misrepresentation, fraud, duress, or undue influence, or because of mental incapacity. Mistake is occasioned by ignorance or misconception of some matter, under the influence of which an act is done, and arises where one of the parties does not mean the same thing as the other, or where one or both, while meaning the same thing, form untrue conclusions as to the subject-matter of the agreement. Mistake does not of itself affect the validity of contracts at all. But mistake may be such as to prevent any real agreement from being formed, in which case the agreement is not merely voidable, as in the case of fraud, but is absolutely void, both at law and in equity. Or mistake may occur in the expression of a real agreement, in which case, subject to rules of evidence, the instrument may be reformed in equity." 9 Cyc., 388. These principles, established by the authorities, will suffice to show that in this case there was no actual meeting of minds, if the defendant R. P. Croom was ignorant of the fact that the plaintiff had no valid mortgage, and was induced, by reason of said ignorance, to surrender his rights in the Hudson car which he had acquired from Kelly by exchange for the Overland and $150. The plaintiff knew that he had no such mortgage, as he had it registered, and, of course, knew the date on which it was done. Our statute provides as follows: "No deed of trust or mortgage for real or personal estate shall be valid at law to pass any property from the donor, bargainor, or mortgagor, but from the registration of such deed of trust or mortgage" in the proper county. If, therefore, the defendant Croom was induced to believe that there was a valid mortgage on the car, and acted upon that assumption of fact in making the alleged agreement with the plaintiff, when otherwise he would not have made the agreement at all, there was such a mistake of fact as prevented the assent of both parties to the same, and there was consequently no contract. If he erroneously supposed that plaintiff's mortgage had been registered before the exchange was made with Kelly, so as to be a valid lien upon the car, and this caused him to abandon or give it up, or his right

thereto, he would not be bound by the contract, as this would be a material mistake on his part and fatal to the agreement claimed by the plaintiff to have been made between them at Fayetteville. But we do not think that the evidence was in such a state as to warrant the instruction which was given by the court. The matter should have been left to the jury for them to find whether there was a mistake of fact as to the registration and validity of the mortgage upon which defendant acted. A mistake of fact takes place when some material fact, which really exists, is unknown, or some essential fact is supposed to exist which really does not exist. 27 Cyc., 809.

The parties do not agree in their testimony, exactly, as to what was said at the time of the alleged agreement. Plaintiff testified that he had merely stated that he had a mortgage on the car, and that nothing more, in that regard, was said, while defendant testified that he told the Ramsaurs that if Freeman sent a man with a mortgage they thought to be good they should let him have the car, and he said to Freeman that he could have the car if he would send some one for it with the mortgage. What did all this mean? If it meant that Croom was to see the mortgage so as to determine whether or not it was good or a prior lien, no title passed to the plaintiff until the mortgage was sent for his inspection and examined by him; or if it meant that Croom acted under a mistake of fact as to the validity of the mortgage, assuming from what Freeman had said to him that it was valid and a prior lien, when it was not, the same result would follow. There were other phases of the evidence, but they need not be discussed here. In passing upon the question, the jury may consider what Freeman meant by saying that he had a mortgage, or what impression he intended to make upon Croom, and whether Croom, having paid Kelly $150 in cash, which in all probability would be lost to him if he surrendered the car, and having turned over to him the Overland car, would have made the alleged contract with Freeman without knowing whether the mortgage was good against his claim, or without having the mortgage produced; and they may also consider any other fact or circumstance, on either side, which tends to show what the real understanding of the parties was, and, generally, they should consider the language and conduct of the parties and the nature of the transaction throughout in order to arrive at a just and correct conclusion.

There was error in the instruction given to the jury, which entitles plaintiff to another hearing.

New trial.