The Full Commission reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Phillip A. Holmes and the briefs and oral arguments before the Full Commission and found that the appealing party has shown good ground to reconsider the evidence in this matter. Having reconsidered the evidence of record, the Full Commission reverses the Deputy Commissioners Opinion and Award filed October 6, 1999.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing and in a pre-trial agreement submitted prior to the hearing as:
 STIPULATIONS
1. The parties are subject to and bound by the North Carolina Workers Compensation Act.
2. An employer-employee relationship existed between the plaintiff and the defendant-employer on June 2, 1997.
3. Defendant, The Hartford, was the carrier on the risk on June 2, 1997.
4. On June 2, 1997, plaintiff experienced an injury by accident to her back arising out of and in the course and scope of her employment with defendant-employer. Employees average weekly wage at the time of her injury was $183.82 which yields a corresponding compensation rate of $122.56.
5. The parties introduced Stipulated Exhibit No. 1, which consisted of Activity Log Manual Comments prepared by The Hartfords claim representatives.
6. The parties had entered into a Compromise Settlement Agreement on or about November 19, 1998 and Deputy Commissioner Douglas Berger filed an Order approving the Compromise Settlement Agreement on November 30, 1998.
7. The issue for determination at the hearing before the Deputy Commissioner was "Whether the Compromise Settlement Agreement entered into between the parties on November 19, 1998 and the Order approving the Compromise Settlement Agreement filed on November 30, 1998, should be set aside due to fraud, misrepresentation, undue influence or mutual mistake of fact and if so, to what additional benefits is plaintiff entitled.
 ***********
Based on the credible evidence of record and the foregoing stipulations, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, age 23 at the time of the hearing before the deputy commissioner, was a college graduate working for the defendant-employer as a camp counselor.
2. On June 2, 1997, plaintiff was working in the course and scope of her employment taking down a ropes course when she fell approximately 30-35 feet, landing on her back. Plaintiff was taken to the Sloop Hospital in Crossnore, North Carolina and was diagnosed as having an L-1 disc burst fracture. She was transferred to the St. Josephs Hospital in Asheville, North Carolina and was treated by orthopedist Dr. James Hoski. A CT scan revealed an L-1 fracture with anterior, middle and posterior column fractures and a 50% cord compromise. On June 4, 1997, Dr. Hoski performed an L-1 corpectomy and fusion with insertion of a titanium body cage. Dr. Hoski was assisted by Dr. Kennerly, a thoracic surgeon, since the surgery by Dr. Hoski had to be performed anteriorly through the left side of plaintiffs chest even though the fusion site is the lower lumbar spine. Plaintiffs care was then transferred to the Thoms Rehabilitation Hospital where she received primary rehabilitative treatment for her back condition. Plaintiff also continued her treatment with Dr. Hoski.
3. On July 1, 1997, Dr. Hoski obtained x-rays of the back which revealed that the titanium cage and corresponding hardware was intact and there were no changes. Dr. Hoskis follow-up exams on July 30, 1997, September 2, 1997, October 7, 1997, November 11, 1997, February 10, 1998 and June 9, 1998, all involved a review of lumbar x-rays and the medical reports from each respective examination revealed that the titanium cage and hardware was properly positioned and that the junction between plaintiffs own bone and the bone graft was healing.
4. On February 10, 1998, Dr. Hoski stated that plaintiff had reached maximum medical improvement and issued a 20% permanent partial impairment rating to the back. He further stated that plaintiff could return to medium heavy physical demand work with occasional lifting of up to 100 pounds, frequent lifting up to 50 pounds and constant lifting up to 20 pounds.
5. Following his examination of plaintiff on June 9, 1998, Dr. Hoski stated that plaintiff could resume more normal activities. Plaintiff expressed a desire to return to water skiing and other outdoor activities, and Dr. Hoski recommended that she avoid going through any water skiing courses or jumps. He also stated that plaintiff should not do any rappelling.
6. Shortly after plaintiff received her permanent impairment rating from Dr. Hoski, plaintiff entered into negotiations with Janet Fall, an insurance claims representative for The Hartford, to discuss possible resolution of her workers compensation claim. Plaintiff was not represented by counsel at this time and was relying on the assurances of Dr. Hoski that she was doing well and there were no problems, which due to an error in diagnosis by Dr. Hoski was not in fact true. During her dealings with The Hartford representatives, plaintiff was told by Ms. Fall that she had two options, either receive permanent partial disability based on her impairment rating or settle her claim for a lump sum payment equal to her permanent partial disability based on her impairment rating plus an additional sum for future medical expenses that she may incur. This was a misrepresentation in that plaintiff may have been able to receive compensation for the loss of body part (tenth rib removed during surgery) and serious bodily disfigurement (scarring), which was never brought to plaintiffs attention by Ms. Fall.
7. Ms. Fall continued settlement negotiations with plaintiff through June, 1998, when she was transferred to The Hartford claims office in Syracuse, New York. Her last activity log entry on June 11, 1998, notes that plaintiff was offered $11,354.00 for a clincher agreement which represented $7,354.00 for the 20% impairment rating and an additional $4,000.00 for future medical expenses. At that time, plaintiff was still deciding whether to accept this proposal.
8. Beginning in July, 1998, Brian Henderson became The Hartford representative handling the claim and he ultimately entered into a clincher agreement with plaintiff for the total payment of $13,504.00. The amount represented $7,354.00 for the 20% impairment rating with the remaining amount of $6,150.00 to represent any future medical treatment plaintiff would need, consideration for any change of condition, and payment for Dr. Hoskis December, 1998 examination. Plaintiff signed the clincher agreement on or about November 19, 1998, and Deputy Commissioner Douglas Berger approved the clincher agreement on November 30, 1998.
9. On December 10, 1998, plaintiff returned to Dr. Hoski for a follow-up visit that had been scheduled during her June 1998 follow-up and new lumbar x-rays were made. Dr. Hoski noted that the titanium plate and cage were well positioned but noticed one of the small screws was backing out anteriorly. He was concerned about the screw potentially putting pressure upon the aorta and wearing a hole in the aorta, which could be life threatening to plaintiff. A follow-up CT scan confirmed Dr. Hoskis findings. He believed the movement of the screw was a consequence of vibrations and motions involving her back.
10. After finding the problem with the screw in a December 10, 1998 radiograph, review of prior x-rays revealed that the screw had began to back out between November 1997 and February 1998. Dr. Hoski explained that x-ray films from the front allow him to see if the plate and cage are positioned correctly and to see if there is a loosened line, which would indicate that the bone graft was not healing. The films with the frontal view would show a head on view of the screw, which would not show whether the screw was backing out. A lateral view could show a screw backing out if the angle the film was taken from was just right, but Dr. Hoski noted that patients are never positioned the same way for x-rays and just a slight rotation and you may not see the screw head.
11. Dr. Hoski testified at his deposition, and the Full Commission finds as fact, that the screw began to back out between November 11, 1997 and February 10, 1998. Dr. Hoski also stated that "the only way, unfortunately, that she would have known that something was wrong is if it had eroded her aorta and she had this catastrophic event, so she wouldn't say my back hurts. The Full Commission finds as fact that Dr. Hoskis error in diagnosing the problem with the screw was a mistake of an existing fact and was not known to plaintiff or defendant at the time the parties agreed to the compromise settlement agreement.
12. Dr. Hoski and one of his colleagues determined that follow-up surgery was needed in order to remove the screw and on April 12, 1999, Dr. Hoski and Dr. Kennerly performed a thoracotomy to remove the screw. Following this second surgery, plaintiff attended physical therapy and Dr. Hoski anticipated that she would be able to resume normal activities six weeks following physical therapy. Dr. Hoski was unable to state whether plaintiff retained any additional permanent impairment to her lumbar spine as a result of the second surgery. However, plaintiff has a scar that begins below the waistline on the left between her navel and the further anterior point of the left pelvis and extends upward, wrapping around her left side and ends just below her bra-line approximately four inches from her spinal column. The scar is approximately a half inch wide, reddish in color and raised at various points and depressed at others.
13. After Dr. Hoski released plaintiff to resume normal activities in June, 1998, with her permanent restrictions, plaintiff returned to work as a residential counselor for Sipes Orchard Home and continued working at this facility through April, 1999. At the hearing, plaintiff stated she could no longer perform her job at Sipes Orchard Home because of the physical requirements but she was presently looking for alternative employment.
 ***********
Based upon the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. In order for the Industrial Commission to set aside the Compromise Settlement or Clincher Agreement which is the subject of this claim, plaintiff has the burden of showing that the Settlement Agreement was entered into and approved under circumstances of fraud, misrepresentation, undue influence or mutual mistake of fact and plaintiff has met that burden. The compromise settlement agreement should be set aside and declared null and void. N.C. Gen. Stat. 97-17.
2. Dr. Hoskis error in diagnosis was a mistake of fact that existed prior to the approval of the compromise settlement agreement and was not known to the parties. "A mistake of fact takes place when some material fact, which really exists, is unknown, or some essential fact is supposed to exist which really does not exist. Freeman v. Croom, 172 N.C. 524,90 S.E. 523 (1916). "A release from liability for personal injury may be set aside for mutual mistake based upon error in diagnosis, since such mistake relates to mistake of existing fact as to the extent of a known injury, but a release may not be set aside for mistake in prognosis, since such mistake relates to error in judgment or opinion as to the future course or consequences of a known injury, and is not a mistake of existing fact. Caudill v. Chatham Manufacturing Company, 258 N.C. 99,128 S.E.2d 128 (1962).
3. The carrier made misrepresentations to plaintiff and thereby limited her to two possible options regarding her claim. Therefore, the compromise settlement agreement approved on November 30, 1998 should be set aside. N.C. Gen. Stat. 97-17.
4. Plaintiff is entitled to compensation for the permanent scarring resulting from the surgery for her compensable injury. N.C. Gen. Stat. 97-31(24).
5. Plaintiff is entitled to payment for all medical expenses related to plaintiffs compensable injury which are designed to effect a cure, give relief or lessen the period of plaintiffs disability to include the surgery to remove the screw that backed out of the spinal cage. N.C. Gen. Stat. 97-25.
6. Defendants defense of this claim was not founded upon stubborn, unfounded litigiousness and therefore, no attorney fees are owed to plaintiffs counsel for same. N.C. Gen. Stat. 97-88.1.
 ***********
Based upon the foregoing stipulations, findings of fact and conclusions of law, the Full Commission makes the following:
 AWARD
1. Plaintiffs request to set aside the Compromise Settlement Agreement approved by the North Carolina Industrial Commission on November 30, 1998, is hereby GRANTED.
2. Defendant shall pay plaintiff compensation at a rate of $122.56 per week beginning April 12, 1999 and continuing until plaintiff returns to work at the same or greater average weekly wage or until further order of the Industrial Commission.
3. Defendants shall pay all medical expenses incurred by plaintiff that are causally related to plaintiffs compensable injury.
4. Plaintiffs entitlement to compensation under N.C. Gen. Stat.97-31(22), 31(23) or 31(24) is reserved for a future date.
5. Defendants shall pay plaintiffs counsel 25% of all compensation awarded herein. Furthermore, defendants shall pay plaintiffs counsel an attorney fee equal to 25% of all medical compensation payable from November 19, 1998 through the file date of this Opinion and Award. Defendants shall pay plaintiffs counsel a lump sum for those amounts that are due and owing and thereafter shall pay every fourth check until further order of the Commission.
6. Defendants shall pay the costs.
This 13th day of March 2001.
 S/ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
DISSENTING:
 S/_______________ DIANNE C. SELLERS COMMISSIONER